MONIQUE C. WINKLER (Cal. Bar No. 213031)
 winklerm@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
 leejh@sec.gov
RAHUL KOLHATKAR (Cal. Bar No. 261781)
 kolhatkarr@sec.gov
JOHN P. MOGG (Cal. Bar No. 219875)
 moggj@sec.gov
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:   (415) 705-2501

JOSEPH G. SANSONE (NY Bar No. 4043659)
 sansonej@sec.gov
100 Pearl St., Suite 20-100
New York, New York 10004-2616
Telephone:  (212) 336-1100

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ANDREAS BECHTOLSHEIM,<br><br>Defendant. | Case No. C-<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY**

1. This action concerns insider trading by Defendant Andreas "Andy" Bechtolsheim ("Defendant" or "Bechtolsheim") in the securities of Acacia Communications, Inc. ("Acacia"), a maker of high-speed optical interconnect products whose stock was publicly traded.  Bechtolsheim, the founder, Chief Architect and former Chairman of Arista Networks, Inc. ("Arista Networks"),

misappropriated material nonpublic information regarding the impending acquisition of Acacia and used that information to trade Acacia securities the day before the announcement of Acacia's acquisition by Cisco Systems, Inc. ("Cisco"). Bechtolsheim learned of this material nonpublic information about Acacia's impending acquisition through his confidential relationship with a multinational technology company ("Tech Company A") that was also considering an acquisition of Acacia.

2. On July 8, 2019, a senior employee of Tech Company A ("Tech Company A Manager") contacted Bechtolsheim and confidentially discussed with him Acacia's imminent acquisition in the context of determining whether Tech Company A should submit a bid to acquire Acacia. Immediately after learning the material nonpublic information about Acacia's imminent acquisition and based on that information, Bechtolsheim traded Acacia option contracts in the accounts of a close relative ("Relative") and associate ("Associate") just minutes before the market closed.

3. On July 9, 2019, before market open, Acacia and Cisco announced that Cisco had entered into a definitive agreement to acquire Acacia for $70 per share. That day, Acacia's stock price increased by 35.1% and Bechtolsheim's trading generated combined profits of $415,726 in the accounts of the Relative and Associate.

4. By engaging in insider trading as described in this Complaint, Defendant violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

**JURISDICTION AND VENUE**

5. The Commission brings this action pursuant to Sections 21(d) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1].

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u-1 and 78aa].

7. Defendant, directly or indirectly, made use of the means or instrumentalities of interstate commerce, and of the mails, and of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein.

8. Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because a substantial part of the acts and transactions constituting the violations alleged in this Complaint occurred within the Northern District of California.

## INTRADISTRICT ASSIGNMENT

9. Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division, because a substantial part of the events which give rise to the claims alleged herein occurred in Santa Clara County.

## DEFENDANT

10. **Bechtolsheim** is 68 years old and resides in Incline Village, Nevada. Bechtolsheim is the founder of Arista Networks, Inc., a publicly-traded company, and currently serves as its Chief Architect. Bechtolsheim served as Chairman and Chief Development Officer of Arista Networks from October 2008 to December 2023, when he resigned from these positions. Bechtolsheim has held high-level positions at other publicly-traded companies throughout his career, dating back to the early 1980s when he helped found a large Silicon Valley based technology company.

## RELEVANT ENTITIES

11. **Acacia**, incorporated in Delaware and now a subsidiary of Cisco, manufactures high-speed optical interconnect products. Before market open on July 9, 2019, Acacia and Cisco announced that Acacia had entered into an agreement to be acquired by Cisco, and the acquisition closed on March 1, 2021. Prior to the closing of the acquisition, Acacia's securities were listed on the NASDAQ Global Select Market and the Chicago Board Options Exchange under the ticker "ACIA." Acacia's principal corporate offices are in Maynard, Massachusetts.

12. **Arista Networks**, incorporated in Delaware, provides cloud networking products and makes ethernet switching and routing platforms. Arista Networks's stock is listed on the New York Stock Exchange under the ticker "ANET." Arista Networks's principal corporate offices are in Santa Clara, California.

13. **Cisco**, incorporated in Delaware, makes products related to digital networking, security, and cloud applications. Cisco's stock is listed on the NASDAQ Global Select Market under the ticker "CSCO." Cisco's principal corporate offices are in San Jose, California.

**FACTUAL ALLEGATIONS**

**A. Bechtolsheim Learns Material Nonpublic Information Regarding Acacia's Impending Acquisition**

14. Tech Company A and Arista Networks at all relevant times shared a confidential business relationship. Employees of Tech Company A and Arista Networks, including Tech Company A Manager and Bechtolsheim, were bound by a non-disclosure agreement ("NDA") to maintain the confidentiality of information shared between the two companies and also had a history, pattern, or practice of sharing confidential information with each other. In this context, Tech Company A Manager and Bechtolsheim shared confidential information with each other, and understood that their conversations were subject to an NDA between their companies.

15. Tech Company A and Acacia engaged in confidential discussions concerning Tech Company A's potential acquisition of Acacia from April 2019 through July 8, 2019. On the morning of July 8, 2019,[1] a representative of Acacia contacted Tech Company A's Chief Financial Officer ("CFO") to inform him that another company had made an offer to acquire Acacia and inquired whether Tech Company A would be in a position to submit a competing offer for Acacia. Immediately after this conversation, Tech Company A's CFO called Tech Company A Manager to discuss the potential impact of an acquisition of Acacia by another company on Tech Company A's business. Tech Company A Manager suggested to the CFO that Tech Company A Manager contact Bechtolsheim confidentially to help them assess the impact of an acquisition of Acacia.

16. Approximately one hour after Tech Company A's CFO and Tech Company A Manager spoke on July 8, 2019, Tech Company A Manager texted Bechtolsheim's cell phone that he "need[ed] to chat . . . rather urgent[ly] regarding a possible transaction in the optics space." Minutes later, Bechtolsheim and Tech Company A Manager spoke by telephone and discussed the imminent acquisition of Acacia as well as any potential impact on Tech Company A.

17. Bechtolsheim knew or was reckless in not knowing that the information he learned about Acacia's impending acquisition was material and nonpublic. Bechtolsheim also knew or was

---

[1] Unless otherwise stated, all times in this Complaint are in Pacific time.

reckless in not knowing that he had a duty of trust and confidence to keep such information confidential and not trade in Acacia securities based on this information.

18. Arista Networks's insider trading policy, which Bechtolsheim acknowledged receiving and reviewing, stressed that trading on the basis of material nonpublic information is illegal and outlined potential penalties for insider trading. Arista Networks's insider trading policy also specifically prohibited "misuse of any nonpublic information of other companies, such as [Arista Networks's] distributors, vendors, customers, collaborators, suppliers and competitors" and stated that "nonpublic information . . . acquire[d] in the course of [employment] with [Arista Networks] may only be used for legitimate . . . business purposes . . . [and] should be handled in accordance with the terms of any relevant nondisclosure agreements." Bechtolsheim also received trainings at Arista Networks concerning insider trading and the proper handling of nonpublic information.

**B.  Bechtolsheim Immediately Trades Acacia Option Contracts**

19. A stock option, commonly referred to as an "option," gives its purchaser-holder the right to buy or sell shares of an underlying stock at a specified price prior to the expiration date. Options are generally sold in "contracts," which give the option holder the right to buy or sell 100 shares of an underlying stock. The two types of stock options are calls and puts.

20. A "put" option gives the purchaser-holder of the option the right, but not the obligation, to sell a specified amount of an underlying security at a specified price (i.e., the "strike price") within a specific time period before an expiration date. Generally, the buyer of a put option anticipates that the price of the underlying security will decrease during a specified period of time.

21. Although the purchase of a put option is a bearish trade, "writing," or selling without owning, a put option is bullish as the seller collects the proceeds (the "premium") from the sale of the put option and would keep those proceeds if the value of the put option does not increase in value. Generally, when the underlying stock decreases in price, the value of related put options would increase in value. Conversely, an increase in the underlying stock price would generally lead to a decrease in the value of the put option. Writing put options is one method of profiting when an investor believes that the underlying stock price will rise in value.

22. Immediately after speaking with Tech Company A Manager on July 8, 2019, and minutes before the market closed, Bechtolsheim called a brokerage firm where Relative maintained a brokerage account and arranged to write Acacia put option contracts in Relative's account.

23. Between 12:56 PM and 12:58 PM on July 8, 2019, Bechtolsheim accessed Relative's account and wrote 400 Acacia put option contracts with a strike price of $50 and an expiration date of July 19, 2019 for a premium of $95,396. At 12:57 PM, Bechtolsheim simultaneously accessed the brokerage account of Associate and wrote 200 Acacia put option contracts with a strike price of $65 and an expiration date of July 19, 2019 for a premium of $332,130.

24. Acacia's stock traded between $47.51 and $48.41 on July 8, 2019. Relative and Associate had previously provided Bechtolsheim with authority to trade in these brokerage accounts and were not aware of Bechtolsheim's relevant Acacia trades at the time they were made.

25. On July 9, 2019, before market open, Acacia and Cisco announced to the public that Cisco had entered into a definitive agreement to acquire Acacia for $70 per share. That day, the price of Acacia stock rose sharply and closed at $64.91 per share, a 35.1% increase from its $48.06 closing price on the previous trading day.

26. A representative of Relative's brokerage firm called Bechtolsheim on July 9, 2019 on a recorded line to discuss Bechtolsheim's profitable Acacia trades and mentioned that Cisco would acquire Acacia for $70 per share. Bechtolsheim stated on the call, "[T]he rumor I heard was [Tech Company A] was going to buy [Acacia]," despite the fact that a potential acquisition of Acacia by any party was not publicly known prior to the July 9, 2019 announcement.

27. The 600 put option contracts written by Bechtolsheim in the brokerage accounts of Relative and Associate expired on July 19, 2019 and those accounts retained the premiums associated with writing the put options. As a result, Bechtolsheim's trading generated combined profits of $415,726 in Relative's and Associate's accounts.

**FIRST CLAIM FOR RELIEF**

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

28. Paragraphs 1 through 27 are hereby re-alleged and are incorporated herein by reference.

29. At the time of the trading described above, Bechtolsheim knew, or was reckless in not knowing, that the information he learned about an imminent acquisition of Acacia was material and nonpublic. Bechtolsheim also knew or was reckless in not knowing that he was expected to maintain the confidentiality of information that he learned related to the acquisition of Acacia and had a duty of trust and confidence not to trade in Acacia securities on the basis of that information. Bechtolsheim misappropriated the information about Acacia's impending acquisition and fraudulently breached his duty by writing put option contracts on the basis of that information.

30. By engaging in the conduct described above, Bechtolsheim, with scienter, in connection with the purchase or sale of securities as set forth above, directly or indirectly:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities;

by the use of the means or instrumentalities of interstate commerce, and of the mails, and the facilities of a national securities exchange.

31. By reason of the foregoing, Defendant, directly or indirectly, violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

**I.**

Finding that Defendant violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**II.**

Permanently restraining and enjoining Defendant from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Ordering, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], that Defendant be prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### IV.

Ordering Defendant to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-l].

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VI.

Granting such other and further relief as this Court may deem just, equitable, and necessary.

Dated: March 26, 2024                                  Respectfully submitted,

*/S/ John P. Mogg*
John P. Mogg
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION